UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

_____
                                  )
RICARDO DE JESÚS GÓMEZ,           )
PEDRO DÍAZ ORTIZ, AND             )
CARLOS MÉNDEZ BUSÓ, IN THEIR      )
CAPACITY AS SHAREHOLDERS OF       )
DE JESÚS & MATOS MEDICAL IMAGING  )
PROFESSIONALS, P.S.C.,            )
                                  )
                  Plaintiffs,     )
                                  )
          v.                      )        CIVIL ACTION
                                  )        NO. 18-01305-WGY
NELSON FELIPE MATOS RUIZ,         )
IN HIS CAPACITY AS SHAREHOLDER    )
OF DE JESÚS & MATOS MEDICAL       )
IMAGING PROFESSSIONALS, P.S.C.,   )
                                  )
                  Defendant.      )
                                  )
_____ )


_____
DE JESÚS & MATOS MEDICAL IMAGING  )
PROFESSIONALS, P.S.C.,            )
                                  )
                  Plaintiff,      )
                                  )
v.                                )
                                  )
NELSON FELIPE MATOS RUIZ,         )
                                  )
                  Defendant,      )
                                  )
v.                                )        CIVIL ACTION
                                  )        NO. 18-01906-WGY
RICARDO DE JESÚS GÓMEZ, HIS       )
SPOUSE OLGA VANESSA RÍOS ROBLES,  )
AND THE CONJUGAL PARTNERSHIP      )
FORMED BETWEEN THEM; PEDRO DÍAZ   )
ORTIZ, HIS SPOUSE LILIANA ZOE     )
MIRANDA BROCO, AND THE CONJUGAL   )
PARTNERSHIP FORMED BETWEEN THEM;  )
CARLOS MÉNDEZ BUSÓ, HIS SPOUSE    )

[1]

```
YVETTE MARIE CRUZ PAGÁN AND      )
THE CONJUNGAL PARTNERSHIP FORMED )
BETWEEN THEM; DEMADI, PSC;       )
INSURANCE COMPANY XYZ;           )
COMPANY ABC; JOHN & JANE DOE,    )
                                 )
          Third Party Defendants. )
                                 )
_____)
```

YOUNG, D.J.[1]                              May 29, 2024


**FINDINGS OF FACT, RULINGS OF LAW, AND ORDER FOR JUDGMENT**

**I.   INTRODUCTION**

Pursuant to Rule 39(a) of the Federal Rules of Civil Procedure, the parties withdrew their jury demand in this case, and consented to trial before the Court as factfinder.  See Minute Order, ECF No. 197.  After a jury-waived trial, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court provides its findings of fact and rulings of law.

This action arises out of a closely held corporate dispute between five radiologists, Dr. Nelson Felipe Matos ("Dr. Matos") and Dr. Kenneth Badillo ("Dr. Badillo") on the one hand, and their colleagues Drs. De Jesús-Gómez ("Dr. De Jesús"), Pedro Díaz Ortiz ("Dr. Díaz"), and Carlos Méndez Busó ("Dr. Méndez") (collectively "the Other Doctors"), with respect to two related corporate entities through which the doctors practiced: De Jesús

---

[1] Of the District of Massachusetts, sitting by designation.

& Matos Medical Imaging Professionals, P.S.C. ("DJM") and
DEMADI, INC. ("DEMADI") (DJM, DEMADI, Dr. De Jesús, Dr. Díaz,
and Dr. Méndez are collectively referred to as "the DJM
Parties"; the Other Doctors and Dr. Matos are at times
collectively referred to as "the Shareholders").

At its core, these consolidated actions boil down to
calculating the sum of money Dr. Matos is owed as a result of
his removal from DJM, and his withdrawal from DEMADI.  While
represented by able counsel, none of the parties have covered
themselves in glory here.  The evidence reveals that the Other
Doctors and Dr. Matos developed acrimony and distrust over a
period of years, for a variety of reasons.  Ultimately, this
situation resulted in Dr. Matos's legally sufficient, but abrupt
and perhaps insensitive removal from DJM.  Dr. Matos's failure
to participate in the valuation process that followed was, in
this Court's view, unnecessarily stubborn, even in the face of
DJM's slow roll on resolving the issue.

What complicates the matter further is DJM's unfortunate
timing of the restatement of its audited financial statement in
2018, two months after Dr. Matos's removal, to conform actual
revenues to the overstated invoices on DJM's books.[2]  Adding to

---

[2]  The Court takes no position as to the propriety of the
accounting actions here.  The evidence is limited: only the DJM
Parties have submitted expert evidence in this action.  As this
Court indicated during trial, a copy of these Findings of Fact,

the mix is DEMADI, a company related to DJM that did not perform its required three-year valuation.

Contrary to Dr. Matos's claim, as set forth in more detail below, the Court finds that the Other Doctors did not violate their duties of loyalty to DJM, DEMADI, or Dr. Matos for that matter -- at least on this record.  At the same time, the Court does not find Dr. Matos himself violated any duties of loyalty to these companies or his fellow shareholders.

After reviewing the evidence, the bottom line here is that the Other Doctors and Dr. Matos were not acting to intentionally injure each other.  Rather, the Court finds that these doctors had restructured a simple partnership in such a way as to complicate unwinding the relationship.

Cutting to the chase, Dr. Matos is entitled to monetary compensation for removal from, and services rendered to, DJM in the sum of **$423,504.69** from DJM.  Dr. Matos must tender his shares back to DJM.  As for DEMADI, it is ordered to repurchase Dr. Matos's shares for the sum of **$100,000**, his capital contribution to that corporation.  Each party shall bear their own costs and attorney's fees.  To the extent that this Court

---

Rulings of Law, and Order for Judgment will be transmitted to the Commonwealth of Puerto Rico's Department of Treasury (Departamento de Hacienda) for it to determine what, if anything, ought be done with the information.

relies upon evidence that has been restricted from the public
docket, the information as set forth herein is no longer
restricted, and the underlying documents or testimony may be
made part of the public record by the Court <u>sua</u> <u>sponte</u>, or upon
request of any interested person or entity, after opportunity to
be heard.

## II.  PROCEDURAL HISTORY

This dispute spans two consolidated actions: Civil Action
No. 18-01305 ("the '1305 Action") and Civil Action No. 18-01906
("the '1906 Action").  The '1305 declaratory judgment complaint
was dismissed without prejudice, <u>see</u> Compl., ECF No. 1; Notice
Voluntary Dismissal, ECF No. 83; Obj., ECF No. 84; Order, ECF
No. 86, but because it was the earlier action, all documents
were filed in that action.  After discovery was completed, and
summary judgment was denied, the pleadings presented for trial
follow:

- The '1906 Complaint filed by DJM against Dr. Matos for breach of contract and requesting relief that Dr. Matos comply with the valuation process prescribed under the DJM Shareholder Agreement.  <u>See</u> DJM Compl. 9, '1906 Action, ECF No. 1 ("DJM Complaint").

- Dr. Matos's Amended Counterclaim against DJM.  <u>See</u> Amend. Counterclaim, ECF No. 53 ("Dr. Matos Counterclaim").  The Amended Counterclaim sets out the following counts:

  Count 1: Breach of Contract: DJM failed to pay Dr. Matos for services rendered.

Count 2: Breach of Contract: a request for specific performance for DJM to provide access to the books and records to remove Dr. Matos's name from the company name.

Count 3: Derivative action for the breach of duty of loyalty by the Other Doctors to DJM.

Count 4: Unjust enrichment for DJM's refusal to distribute dividends.

Count 5: Attorney's fees and prejudgment interest.

- Dr. Matos's Amended Third Party Complaint.  See Amend. Third Party Compl., ECF No. 54 ("Dr. Matos Third Party Complaint").  The Third Party Complaint sets out the following counts:

Count 1: Derivative Action for Breach of Duty of Loyalty against DEMADI's directors.

Count 2: Action against DEMADI for breach of contract -- failing to provide Dr. Matos with a valuation determination for the value of his shares and failure to provide access to the books and records.

Count 3: Unjust enrichment for failure to provide dividends.

Count 4 Attorney's fees and prejudgment interest.

Cross motions for summary judgment were denied.  See July 21, 2022 Minute Order, ECF No. 184; October 28, 2022 Mem. & Order, ECF No. 187.  This Court thereafter held a ten-day bench trial on the parties' claims, on various dates, beginning on April 18, 2023 and concluding on May 11, 2023.  See January 10, 2023 Minute Order, ECF No. 197.  At the conclusion of the trial, the Court took the matter under advisement.

## III. FINDINGS OF FACT

### A.   Background Regarding DJM

On March 19, 2007, Dr. Matos and Dr. De Jesús entered into a partnership, incorporated as DJM, a professional services corporation for the purposes of engaging in the practice of Radiology.  In March 2007, DJM adopted By-Laws.  See Ex. 2 ("DJM By-Laws").[3]  The DJM By-Laws provide at Article VI, Section 12:

> Unless otherwise prohibited by the Certificate of Incorporation, any action required to be taken at any annual or special meeting of shareholders, or any action which may be taken at an annual or special meeting, may be taken without a meeting, without prior notice and without a vote, if a consent in writing setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those shareholders who have not consented in writing.

Id. at 7.[4]  DJM changed its accounting method from cash basis to accrual basis in 2010.

---

[3] References to admitted trial exhibits are "Ex."

[4] This appears to be taken almost verbatim from Puerto Rico law:

> Unless otherwise provided in the certificate of incorporation, any action required by this subtitle to be taken at any annual or special meeting of stockholders of a corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding

On November 19, 2013, Dr. Matos, De Jesús, Dr. Díaz, and Dr. Méndez each became 25% shareholders pursuant to the De Jesús & Matos Medical Imaging Professionals, P.S.C. Shareholders Agreement("DJM Shareholder Agreement").  Ex. 1, DJM Shareholders Agreement.  The DJM Shareholders Agreement had an "Addendum to De Jesús & Matos Medical Imaging Professionals P.S.C. Shareholders Agreement as to Involuntary Withdrawal" ("DJM Shareholders Agreement Addendum").  Ex. 3.  The Shareholders acknowledged that each had been provided with the DJM By-Laws and Certificate of Incorporation.  Ex. 1.

On December 29, 2014, Dr. Matos, Dr. De Jesús, Dr. Díaz, and Dr. Méndez amended the DJM Shareholders Agreement to add Dr. Badillo as a new shareholder in the corporation, resulting in each holding a 20% interest in DJM.  Ex. 4.

---

stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shareholders entitled to vote thereon were present and voted and shall be delivered to the corporation by delivery to its designated office, its principal place of business or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to a corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

P.R. Laws Ann. tit. 14, § 3657(a).

**B.   DJM Shareholders Always Paid Equally And By Agreement.**

The parties' testimony was consistent that the shareholders always agreed to pay themselves equally, though there was some equitable variation for expenses.  There was never a guaranteed timing or amount of payment.  Essentially, the shareholders from time to time reviewed the amount of cash on hand and the amount of current expenses.  After paying expenses and setting aside a reserve, the rest of the funds were always distributed evenly amongst the shareholders either directly or through their respective entities.

Until his removal, Dr. Matos was the shareholder that authorized payments by DJM, including the payments to the shareholders (or their respective entities).  Before issuing any payment to the other shareholders, Dr. Matos would seek the remaining DJM shareholders' approval of a particular amount: Dr. Matos would not issue payments unilaterally.

**C.   DJM Shareholders Make Changes to Accounting Purportedly For Tax Purposes in 2015.**

Prior to June 4, 2015, DJM's bookkeeper, Michele Llirán ("Llirán"), at the direction of Dr. Matos, and with apparent concurrence of the Other Doctors, had created a recurring invoice in the DJM accounting system in the amount of $40,000 per month, per shareholder.  If the amount decided by the shareholders as their payment differed from the $40,000 in the

recurring invoice, Llirán would adjust the invoice by voiding it and issuing a new one for the approved amount.

In 2015, two things changed.  First, DJM reached a settlement with a hospital over a contract dispute, and it therefore expected a boost in income and revenue from the recovery on that contract.  Second, there was a time sensitive opportunity under Puerto Rico law to prepay taxes on dividends at a lower rate.

On June 4, 2015, the DJM shareholders agreed to have invoices for professional services entered in DJM's accounting system in the amount of $60,000 per month, per shareholder, for fiscal year 2015 (which coincided with the calendar year).  See June 4, 2014 Meeting Minutes 3, Ex. 28.  The shareholders purportedly paid themselves with dividends in that year for tax reasons.  As far as the record indicates, each of these doctors and their individual entities paid Puerto Rico taxes on the monies actually disbursed to them.  This may not be the case for DJM's Puerto Rico tax returns since the invoices for $60,000 per shareholder per month may have been reported as a corporate expense when, in fact, it bore no relation to the sums actually disbursed.  This Court expresses no opinion thereon but will transmit a certified copy of this opinion to the Puerto Rico taxing authorities for such review as it may wish to pursue.  Dr. Matos, who was responsible for the finances of DJM,

permitted this invoicing to continue after December 2015.  The $60,000 invoices entered into the accounting software after December 2015 were not authorized by the other shareholders.

### D.   Background Regarding DEMADI

On February 12, 2009, DEMADI was formed as a professional services company and in 2014 a Stockholders Agreement was made between its shareholders.  See Stockholders Agreement DEMADI, P.S.C. ("DEMADI Stockholders Agreement"), Ex. 8.  The ownership interests and initial capital contributions of DEMADI owners at that time was: Dr. Francisco Arraiza Antonmattei ("Dr. Arraiza"),[5] 31% and $155,000; Dr. Matos, 20% and $100,000; Dr. Díaz, 29% and $145,000; Dr. De Jesús, 20% and $100,000.  Id. at DEM 152.  Dr. Matos is a shareholder and director of DEMADI. The DEMADI Stockholders Agreement provides that the shareholders (identical to those of DJM for these purposes) were to gather every three years to determine the value of the shares of DEMADI.  Id. § 2.3.  This, however, has never happened, and all its shareholders paid little attention to DEMADI.  DEMADI has never declared dividends, and is essentially a dormant affiliate of DJM, having no independent employees.

In response to this litigation, DEMADI and the Other Doctors provided expert testimony valuing Dr. Matos's interest

---

[5] Dr. Arraiza is not a party to this action.

in DEMADI at $0.  The Court rejected this testimony at trial and gives it no weight herein.

Under the DEMADI Stockholders Agreement, "[t]he decision issued by the Certified Public Accountant selected for the Valuation Determination, regarding the value of the stockholders Company interest in the Company shall be final and unappealable."  Id.  Section 1.4 provides that "if the [sale] occurs more than one year after the valuation has been made, a new valuation determination shall be prepared for the purposes of determining the value of the Company at the time of the [sale]."  Id. § 1.4.

As for selling shares, the DEMADI Shareholder Agreement provides extremely restricted rights.  Other than death, disability, divorce, and involuntary withdrawal –– conditions that have not occurred in the context of this action –– voluntary tender and purchase of shares is not mandatory:

> If the shares are offered to the Company or a
> Stockholder, but no bona fide prospective purchaser
> has offered to purchase such shares, the shares **may** be
> bought by the Company at a price of the latest
> Valuation Determination.

Id. § 3.1(c) (emphasis added).  DEMADI has not yet agreed to purchase Dr. Matos's shares, and on this record, is under no obligation to do so.

While Dr. Matos is still a director and shareholder in DEMADI, he has been excluded from participation in its affairs.

There is evidence that Dr. Matos has abandoned his interest in DEMADI.  Since July 20, 2018, Dr. Matos merely has wanted to sell his shares in DEMADI back to that corporation.

### E.   Dr. Matos's Removal from DJM

Dr. Matos left Puerto Rico and moved to Florida in September 2015, and it was after this move that acrimony accelerated between the shareholders.  There is credible evidence that Dr. Matos caused at least one employee to be hired without approval of the other shareholders, that he did not assist his fellow shareholders in the aftermath of Hurricane Maria, that he improperly used DJM's provider number, that he did not disclose his expert witness services to his fellow shareholders, and at times did not perform professional services when required to do so.  In sum, after these and other defalcations, Dr. De Jesús, Dr. Díaz, and Dr. Méndez no longer trusted their colleague and wanted him out.

Dr. De Jesús, Dr. Matos, Dr. Díaz, Dr. Badillo, and Dr. Méndez had agreed to hold a monthly meeting on May 17, 2018. Dr. Matos had travelled to Puerto Rico during that week to attend to his responsibilities at DJM and to participate in the meeting.  DJM's meeting set for May 17, 2018, however, was cancelled earlier that day.

On May 18, 2018, Drs. De Jesús, Díaz, and Méndez met in secret -- each was a 20% shareholder.  Drs. Matos and Badillo,

also 20% shareholders of DJM at the time of the meeting, were not notified, did not participate, and did not vote in the May 18, 2018 meeting.  The purpose of the meeting was to vote to remove Dr. Matos from DJM.

The DJM Shareholders Agreement, Section 9, "Involuntary Withdrawal – Transfer of Corporation Interest" provides in pertinent part:

> **Upon the vote of three/fourths of the other Shareholders as provided in Section 14(b),** and the written request of such Shareholders to that effect, any Shareholder **will, immediately upon delivery of the request, sell his Corporation interest to the Corporation.** The withdrawing Shareholder shall remove his personal effects from the office of the Corporation and return all Corporate property on or before the date agreed to with or indicated by the remaining Shareholders.

DJM Shareholders Agreement § 9(a) (emphasis added).  Section 9(b) states that "[t]he terms upon which a Shareholder may be involuntarily withdrawn shall be stated by an Addendum to this Agreement." Id. § 9(b).

The Addendum to the DJM Shareholder Agreement provides a non-exclusive variety of reasons for termination.  See DJM Shareholders Agreement Addendum §§ 1(a)-(p).  The Addendum also states that "[i]f a Shareholder engages in conduct constituting cause for involuntary withdrawal, the remaining Shareholders shall –- at their sole discretion –- initiate an involuntary

[14]

withdrawal election in accordance with Section 9 and 14(b) of

the [DJM] Shareholders Agreement." Id. § 2.

Section 14(b) of the DJM Shareholders Agreement provides:

> All decisions to be taken by the Shareholders
> shall be either in person or by proxy in favor of
> another shareholder, by majority of all the
> Shareholders' vote, except that the following matters
> shall require three/fourths affirmative vote of all
> Shareholders and three/fourths affirmative vote of the
> Shareholders percentage interest in the Corporation: .
> . . .

DJM Shareholders Agreement § 14(b).  Notably, the DJM

Shareholders Agreement has an integration clause stating that in

the event of a conflict between the DJM Shareholder Agreement

and an Addendum, "the provisions of the Addendum shall apply."

Id. § 31.

Not surprisingly, Dr. De Jesús, Dr. Díaz, and Dr. Méndez

each voted "yes" to involuntarily remove Dr. Matos, and

testified that they stand by that decision today.  At the time,

and at trial, Dr. Badillo confirmed that his position was a "no"

vote had he been notified and participated.  During that

weekend, from May 18 through May 20, 2018, Dr. Matos and Dr.

Badillo were on call on behalf of DJM.

On the morning of May 21, 2018, Drs. De Jesús, Díaz and

Méndez notified Drs. Badillo and Matos of their decision.  See

Certification Vote Involuntary Withdrawal [DJM] Shareholder

Written Notice Outcome Vote Request Immediate Sale Shareholder

Interest ("the Notice"), Ex. 5.  Specifically, the Notice relates that Dr. Matos was removed for "conduct includ[ing], but . . . not limited[] to: [d]ishonesty as to the affairs of [DJM]; . . . [n]eglecting to perform . . . assigned duties in the practice of Radiology; . . . [n]eglecting to perform . . . assigned duties in furtherance of [DJM's] interests; and . . . [b]reaching the trust of the remaining [s]hareholders for the purpose of gaining a personal benefit."  Id. at 2.

On that same date, Dr. De Jesús, Dr. Díaz, and Dr. Méndez filed the '1305 Action, seeking a declaration that their actions were valid under Puerto Rico law.

There was a meeting on May 21, 2018, that included Dr. Badillo, but not Dr. Matos.  After May 21, 2018, DJM, Dr. De Jesús, Dr. Díaz, and Dr. Méndez cut off all direct communication with Dr. Matos.

**F.   DJM Accounting Issues Result In Restatement**

On July 2, 2018, DJM issued its Audited Financial Statement for fiscal year 2017.  De Jesus & Matos Medical Imaging Professionals PSC Financial Statement December 31, 2017, Ex. 6. At some point after Dr. Díaz took over the financial operations of DJM, he learned that the $60,000 invoices had been accruing even after December 2015.  He brought this to the attention of Dr. Méndez and Dr. De Jesús.  Dr. Díaz, Dr. Méndez, and Dr. De Jesús subsequently met with DJM's external accountant, Certified

Public Accountant, Antonio Sécola ("CPA Sécola"), regarding the existence of various open recurring invoices in the DJM accounting system on behalf of themselves, Dr. Matos, and Dr. Badillo.  Dr. Díaz, Dr. De Jesús, and Dr. Méndez were concerned that the expenses accrued for the professional services of the shareholders were unreasonable, specifically because they had never agreed to pay themselves $60,000 per month, and had never authorized such invoices to be entered on the DJM's books beyond December 2015.

Dr. Díaz, Dr. Méndez, and Dr. De Jesús discussed the matter with CPA Sécola.  On August 8, 2018, according to emails admitted as Exhibit 7, see August 7, 2018 through August 15, 2018 emails, Ex. 7, CPA Sécola provided Dr. De Jesús and Dr. Díaz with two "options" for the purpose of adjusting DJM's books.  Both "options" proposed a significant reduction in DJM's expensed and accrued shareholder compensation.  CPA Sécola explained that, under Option 1, Dr. Matos's accrued compensation would be reduced to $92,000; while under Option 2, his compensation would be reduced to $172,000.  In the case of Dr. Badillo, CPA Sécola explained, his compensation would be reduced to $103,000 under Option 1 and to $183,000 under Option 2.

DJM chose Option 1.  The Court finds that even though it resulted in less accrued compensation due to Dr. Matos, it was reasonable because it most closely represented the revenue

streams of DJM.  The Court credits the reasons for this selection as reasonable as between these two options, and that it was not done to harm Dr. Matos.

Accordingly, DJM requested: (1) the external auditors to amend DJM's Financial Statement 2017 dated July 2, 2018 to adjust the payables; and (2) the external accountants to make an adjustment of the payables and to prepare the corporate tax returns for tax year 2017.  See DJM Corporate Resolution dated August 7, 2018, Exhibit 29; August 10, 2018 email, Ex. 58.  Dr. De Jesús, Dr. Díaz, and Dr. Méndez decided not to adjust the payables for years 2015 and 2016 because, according to them, CPA Sécola advised them that both years were closed.  The adjustment was $310,000 for each of Dr. De Jesús, Dr. Matos, Dr. Díaz, Dr. Méndez, and Dr. Badillo.  See Restated De Jesus & Matos Medical Imaging Professionals PSC Financial Statement December 31, 2017, Ex. 44.

To be sure, the email evidence reveals the Other Doctors' concern about the effect of the adjustment on Dr. Matos and Dr. Badillo, but other than this concern, there is no evidence that the adjustment was triggered by animosity or the self-interest of the Other Doctors.  Indeed, the adjustment was apparently necessitated, in large part, by the unauthorized invoices on DJM's books.  Beginning in August 2018, after Dr. Badillo had

withdrawn, the shareholders were paid based upon on a
productivity formula not relevant here.

**G.    Valuation of Dr. Matos's Interest in DJM**

On July 20, 2018, Dr. Matos's counsel wrote to DJM's
counsel, expressing no interest in contesting the removal, and
recognizing that Section 8 of the DJM Shareholders Agreement was
determinative of the valuation of Dr. Matos's shares.  See July
20, 2018 Letter, Ex. 18.  That letter constituted a demand for
payment of amounts outstanding with respect to DJM and DEMADI.

Section 8(c) of the DJM Shareholders Agreement requires
that the DJM and the withdrawing shareholder jointly select a
certified public accountant ("CPA"), whose valuation decision
would be final.  DJM Shareholders Agreement, §§ 8(c)(i)-(ii).

Subsequently, DJM, DEMADI, Dr. Méndez, Dr. De Jesús, and
Dr. Díaz proposed the joint appointment of a CPA to value Dr.
Matos's interest in DJM and his shares in DEMADI.  Dr. Matos
objected to the joint appointment of that CPA.  Thereafter, DJM,
DEMADI, Dr. Matos, Dr. Méndez, Dr. De Jesús, and Dr. Díaz –– all
through counsel –– met with a CPA Pedro Morazzani ("CPA
Morazzani") to discuss his joint appointment for the valuation
of Dr. Matos's interest in DJM, as per the formula for computing
a withdrawing shareholders' interest in DJM contained in the DJM
Shareholder Agreement, as well as Dr. Matos's shares in DEMADI.

CPA Morazzani issued a proposal to jointly value Dr. Matos's interest as a shareholder of DJM, as well as his shares in DEMADI.  DJM, DEMADI, Dr. De Jesús, Dr. Díaz, and Dr. Méndez agreed to appoint CPA Morazzani, as per his proposal.

Dr. Matos refused, however, to join in the appointment of CPA Morazzani because, among other things, he had learned of the restatement of the audited financial statements for year 2017. Dr. Matos never proposed an alternate accountant to value his interest by joint agreement.

After the '1906 Action commenced, DJM, DEMADI, Dr. De Jesús, Dr. Méndez, and Dr. Díaz engaged CPA Morazzani as an expert to provide the value of DEMADI, to determine the value of Dr. Matos's interest in DJM under the formula established in the DJM Shareholder Agreement, to perform a reconciliation of the amounts due to Dr. Matos after the adjustment of the over accrual of compensation, and review the reasonableness of the restatement of $1,550,000 to the Restated De Jesus & Matos Medical Imaging Professionals PSC Financial Statement December 31, 2017, Ex. 44.

CPA Morazzani followed the formula established in the DJM Shareholder Agreement to value Dr. Matos's interest in DJM. Having done so, Morazzani valued Dr. Matos's interest in DJM at **$145,426**.  The Court credits this calculation.

According to Morazzani, after adjustments, Dr. Matos is entitled to **$122,050**, as amounts payable for services rendered after restatement by DJM.  The Court credits this calculation as well.

In addition, the Court has reviewed the Informative Return-Income Subject to Withholding, Tax Forms 480.6(B), for the fiscal year 2018.  DJM disbursed the following amounts to its shareholders either personally or through their respective entities:

| | |
|---|---|
| Dr. Matos: | $100,812.50[6] |
| Dr. Badillo: | $150,000.00[7] |
| Dr. Méndez: | $408,212.60 |
| De Jesús: | $433,722.60 |
| Dr. Díaz: | $539,806.60 |

See Exs. 39-1 through 39-5; Mot. Submitting Summ. Voluminous Docs., Ex. 1, Audited Financial Statements, ECF No. 216-1.  Dr. Méndez and Dr. De Jesús also received payments of $120,000 each, which were issued by DJM in 2018, but cashed just after the new year in 2019.  These amounts, though not included in the above totals, are included for the purpose of the damages calculation below.

---

[6] Payments through May 2018.

[7] Payments through July 2018.  Dr. Badillo's payments are not considered further.

During 2018, up to his departure, Dr. Matos averaged payments of $20,162.50 per month.  The Other Doctors averaged, over the entire year, payments of $45,048.38 -- a per-month difference of $24,885.88.  During 2017, Dr. Matos averaged $47,086.93 per month, while the Other Doctors averaged $46,142.30 per month -- a difference of $944.63 per month less than Dr. Matos.  Totaling those 17 months, this reveals a difference of $113,093.84 between what the Other Doctors were paid and what Dr. Matos was actually paid.  Other than in 2015 and perhaps early 2016, when it apparently paid its shareholders through dividends, DJM has never declared dividends on retained earnings.

## IV.  RULINGS OF LAW

The Court rules that Dr. Matos was properly removed for cause substantially for the reasons set forth in the Notice.  At that point, he was required to proceed to value his shares under the DJM Shareholder Agreement in the ordinary course not, as argued by Dr. Matos, under a different valuation method.  Dr. Matos's conduct in withdrawing from the selection of a party to value his shares and the simultaneous conduct of Dr. De Jesús, Dr. Díaz, and Dr. Méndez not being transparent, unfortunately, contributed to the amplification of the mistrust and acrimony between these parties.

A.    DJM Complaint

DJM's complaint asks this Court to find Dr. Matos in breach of the DJM Shareholder Agreement and, as a remedy, require Dr. Matos to comply with the valuation process for an involuntarily withdrawn shareholder.  As set forth below, Dr. Matos is in breach of the DJM Shareholder Agreement, and the Court provides appropriate relief.

"When one party to a bilateral contract does not fulfill its commitment, the other may choose between specific performance of the contract or damages and receive interest in either case."  MMG PRCI CFL, LLC. v. BMF, Inc., CV 19-1461 (BJM), 2023 WL 387605, at *4 (D.P.R. Jan. 25, 2023) (McGiverin, M.J.) (citing P.R. Laws Ann. tit. 31, § 3052).  "It is basic law that in a contract case, the plaintiff has the burden of proof to show that there was a contract and a breach."  Muniz-Olivari v. Stiefel Laboratories, Inc., 496 F.3d 29, 38 n.7 (1st Cir. 2007).  Here, the issue is whether either party breached the applicable shareholder agreements.

Contractual interpretation is codified under Puerto Rico law; the applicable standards apply here: "If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.  If the words should appear contrary to the evident intention of the contracting parties, the intention

shall prevail."  P.R. Laws Ann. tit. 31, § 3471.  "In order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract."  Id. § 3472.  "If any stipulation of a contract should admit of different meanings, it should be understood in the sense most suitable to give it effect."  Id. § 3474.  "The stipulations of a contract should be interpreted in relation to one another, giving to those that are doubtful the meaning which may appear from the consideration of all of them together."  Id. § 3745.  The Court rules that Dr. Matos was removed from DJM by a vote of three-fourths of the other shareholders under the contractual terms of the DJM Shareholder Agreement and Addendum to the DJM Shareholder Agreement, and the DJM By-Laws.

Under Section 9 of the DJM Shareholder Agreement, "[u]pon the vote of three/fourths of the other Shareholders as provided in Section 14(b), and the written request of such Shareholders to that effect, any Shareholder will, immediately upon delivery of the request, sell his Corporation interest to the Corporation."  DJM Shareholders Agreement § 9.  Section 9(b) states that "[t]he terms upon which a Shareholder may be involuntarily withdrawn shall be stated by an Addendum to this Agreement."  Id. § 9(b).

In turn, the Addendum to the DJM Shareholders Agreement provides a variety of non-exclusive reasons for termination. Addendum DJM Shareholders Agreement §§ 1(a)-(p).  The Court credits the testimony of Dr. De Jesús, Dr. Díaz, and Dr. Méndez that Dr. Matos's conduct was sufficient cause for his involuntary withdrawal whether or not the specific conduct was enumerated, as the list of conduct was non-exclusive.

The Addendum to the DJM Shareholder Agreement also states that "[i]f a Shareholder engages in conduct constituting cause for involuntary withdrawal, the remaining Shareholders shall –– at their sole discretion –– initiate an involuntary withdrawal election in accordance with Section 9 and 14(b) of the Shareholders Agreement."  Id. § 2.

Section 14(b) of the DJM Shareholder Agreement provides:

> All decisions to be taken by the Shareholders shall be either in person or by proxy in favor of another shareholder, by majority of all the Shareholders' vote, except that the following matters shall require three/fourths affirmative vote of all Shareholders and three/fourths affirmative vote of the Shareholders percentage interest in the Corporation: . . . (v) Termination of a Shareholder.

DJM Shareholders Agreement § 14(b).

At summary judgment, the Court ruled that there were ambiguities in the DJM Shareholders Agreement and questions of fact as to the intentions of the parties precluding summary judgment.  See Memorandum & Order, ECF No. 187.  After receiving

the parties' evidence concerning the DJM Shareholders Agreement, and the intentions of the parties, the Court rules: Dr. De Jesús, Dr. Díaz, and Dr. Méndez, three-fourths of the "other" shareholders, decided involuntarily to remove Dr. Matos.

Plainly put, the Other Doctors had the votes and sufficient cause to remove Dr. Matos for virtually any reason, and they did so.  Neither Dr. Matos, nor Dr. Badillo, were included in this removal decision, but their notification and participation in that decision was unnecessary.  Indeed, there was no need for Dr. Matos to have participated in a decision the effect of which had been predetermined by the Other Doctors.  While perhaps insensitive amongst closely held shareholders, it was the intention of the parties that the DJM Shareholder Agreement permitted removal without unnecessary delay or notice to Dr. Matos, or even other shareholders.  To the extent not ambiguous, this is the "sense most suitable to give [the DJM Shareholder Agreement and Addendum to the DJM Shareholder Agreement] effect."  P.R. Laws Ann. tit. 31, § 3474.  As a result, the Court rejects Dr. Matos's argument that there was a deadlock or that Section 24 of the DJM Shareholder Agreement applies here. Therefore, Dr. Matos was -- and is -- required to sell his shares back to DJM pursuant to Section 8(b) of the DJM Shareholder Agreement.

Section 8(b) of the DJM Shareholder Agreement required the parties jointly to select a certified public accountant to value Dr. Matos's interest in DJM.  Dr. Matos ultimately declined to participate in the selection of the expert in breach of the DJM Shareholder Agreement.  At trial, DJM provided unrebutted evidence by CPA Morazzani that the valuation process has been followed, and there is, therefore, no need to undertake the valuation again.  Indeed, Dr. Matos chose <u>not</u> to provide expert testimony to contradict the valuation.

The Court rules that Dr. Matos is in breach of the DJM Shareholder Agreement, that CPA Morazzani properly calculated Dr. Matos's interest in DJM at **$145,426**, and that payment of this amount shall be in accordance with Section 8(d) of the DJM Shareholder Agreement upon entry of Judgment.  Prejudgment interest and attorney's fees are not awarded, <u>see</u> Sections IV(D) and (E), <u>infra</u>.

**B.  Dr. Matos Counterclaim**

As for the Dr. Matos Counterclaim, judgment enters in favor of Dr. Matos as to Count 1 breach of contract for services rendered in the total amount of **$278,078.69**.  The Court calculates this amount by first crediting CPA Morazzani's calculation of **$122,050** as amounts payable for services rendered after the restatement.  This amount is then adjusted upward by **$113,093.84**, in equity and fairness, to reflect the average

amounts paid to the other shareholders per month in 2017 and for five months in 2018, for a total of **$235,143.84**.[8]  Prejudgment interest on the amount of **$122,050** under Puerto Rico law as set forth below from date of demand: July 20, 2018 to the date of judgment (**May 29, 2024**), i.e., an additional **$42,934.85**.  See Section II(E), infra.  No prejudgment interest shall run as to the equitable adjustment made by the Court.  Thus, after including the prejudgment interest, the total award entered for Count I is **$278,078.69**.

The Court does not credit Dr. Matos's testimony that the invoices represented amounts actually owed to the shareholders. Whether the accounting moves were appropriate with respect to Puerto Rico tax authorities -- something this Court is unclear on -- these doctors always intended and operated to distribute compensation equally from time to time.  The invoicing issue was exacerbated by Dr. Matos permitting unauthorized $60,000 invoices to be placed into the accounting system.  At the same time, whether the shareholders actually received the $60,000 referenced in these invoices is murky, and in equity, because the shareholders always acted to pay themselves equally prior to the removal of Dr. Matos, Dr. Matos should at least get the

---

[8] This adjustment upward in $124,429.40 (which includes $120,000 payments at the end of the year, whether or not cashed in that year), in favor of Dr. Matos for 2018 and an adjustment in reduction by $11,335.56 in 2017.

average monthly per-shareholder compensation of the other
shareholders as an adjustment for services rendered payments.

Count Two, a claim for specific performance is <u>MOOT</u>.  Dr.
Matos has obtained all of the information necessary through
discovery and is being ordered to transfer his shares back to
DJM upon receiving the amounts ordered above.

Judgment shall enter in favor of the Other Doctors as to
Count Three, Dr. Matos's Derivative Action on behalf of DJM.
Dr. Matos has not met his burden to prove a breach of duty of
loyalty to DJM by the Other Doctors.  The Other Doctors did not
breach a duty to DJM.

Furthermore, under Puerto Rico law, "[t]he Business
Judgment Rule creates a presumption that in making a business
decision, directors acted on an informed basis, in good faith,
and in the honest belief that the action taken was in the best
interests of the company.  It assumes that not all decisions by
directors will result in benefit to the corporation or will,
with the benefit of 20/20 hindsight, appear to be prudent."
<u>Federal Deposit Ins. Corp.</u> v. <u>Arrillaga-Torrens</u>, 212 F. Supp. 3d
312, 341 (D.P.R. 2016) (Delgado-Hernández, J.); <u>see</u> P.R. Laws
Ann. tit. 14, § 3563 ("The directors and officers shall be bound
to dedicate to the affairs of the corporation and to the
exercise of their duties the attention and care which in a
similar position and under analogous circumstances a responsible

[29]

and competent director or officer would execute in applying his/her business judgment in good faith or his/her best judgment in the case of nonprofit corporations.  Only **gross negligence** in the exercise of the duties and obligations mentioned above shall result in personal liability.") (emphasis added).

While Dr. Matos makes much of the timing and nature of the restatement of Audited Financial Statement, Dr. Matos introduced no expert testimony to substantiate his allegations of improprieties with respect to DJM's affairs by its directors and officers, much less gross negligence as required by Puerto Rico law.  Rather, the preponderance of the evidence demonstrates that the Other Doctors were trying to solve a problem caused in part by Dr. Matos.  DJM's accounting system and compensation methodology is confusing and contradictory.  The Other Doctors enlisted the assistance of accounting professionals.  The record does not reflect that their decision making was done to harm anyone.  Accordingly, Dr. Matos cannot overcome the business judgment rule and judgment shall enter in favor of the Other Doctors as to Count Three.

Judgment shall also enter in favor DJM as to Count Four for equitable relief.  Again, the allegations of bad faith actions by DJM are unproven.  While the Court takes no position as to the propriety of DJM's restatement, Dr. Matos has simply not met his burden at trial.

As for Count Five, attorney's fees are denied, see Section IV(D), infra, and prejudgment interest is awarded only as set forth above, see Section IV(E), infra.

### C.   Dr. Matos Third Party Complaint

As for the Third-Party Complaint, the Court finds in favor of the Third Party Defendants on all counts of the Third Party Complaint, except as to Count 2 which shall enter, in part, in favor of Dr. Matos only to the extent that Dr. Matos is entitled to access the books and records of DEMADI to the full extent of the law in his capacity as a shareholder and director of DEMADI. To be sure, it is clear that Dr. Matos does not want to be a shareholder or director of DEMADI any further, and the parties have conducted themselves in this manner.  It is also clear that the remaining shareholders in DEMADI -- the Other Doctors -- also want Dr. Matos out.

Those who seek equity must do equity.  See McDonald's Corp. v. Lebow Realty Tr., 710 F. Supp. 385, 389 (D. Mass.), aff'd, 888 F.2d 912 (1st Cir. 1989).  Here, as DEMADI is only a dormant appendage of DJM and its accounting records are hopelessly snarled and subject to manipulation, no one will benefit from the expense of further accounting analysis.  Accordingly, DEMADI will be ordered to return to Dr. Matos his original $100,000 capital contribution and we'll call it quits.

### D. Attorney's Fees

As stated above, the Court does not award any party attorney's fees in this action.  "Where, as here, the court's jurisdiction is based on diversity of the parties, a district court's award of attorneys' fees is governed by relevant state law, in this case Rule 44.1(d) of the Puerto Rico Rules of Civil Procedure."  Holsum de Puerto Rico, Inc. v. Compass Indus. Group LLC, 3:18-CV-02004-JAW, 2022 WL 3456273, at *3 (D.P.R. Aug. 17, 2022) (Woodcock, J.), opinion vacated in part on reconsideration, 3:18-CV-02004-JAW, 2022 WL 14900772 (D.P.R. Oct. 26, 2022) (quoting Fazio v. James River Ins. Co., No. 20-1074 (MEL), 2021 WL 2326356 at *2, (D.P.R. June 7, 2021) (López, M.J.)).  While the claims were hard fought, the conduct of the litigation did not amount to "obstinacy" or "frivolousness" under Puerto Rico Rule of Civil Procedure 44.1(d).[9]  "For a court to make a finding of obstinacy, a litigant must have been **unreasonably** adamant or **stubbornly** litigious, **beyond the acceptable demands of the litigation**, thereby **wasting time** and causing the court and the other litigants **unnecessary** expense and delay."  Id. at *4 (internal quotation marks and brackets

---

[9] P.R. Laws Ap. tit. 32A, § III, Rule 44.1(d) ("In the event any party or its lawyer has acted obstinately or frivolously, the court shall, in its judgment, impose on such person the payment of a sum for attorney's fees which the court decides corresponds to such conduct.").

omitted).  Litigation is a time-consuming and expensive process.
Closely-held shareholder actions are particularly destructive,
oftentimes with Pyrrhic results.  Attorney's fee awards under
Puerto Rico law are a penalty.  The claims here are not
frivolous, but vigorously litigated by able counsel to this
Court.  Accordingly, absent a finding of obstinacy, the Court in
its discretion does not award attorney's fees with respect to
any party or any claim.

### E.  Prejudgment Interest

"[T]he award of prejudgment interest in diversity cases is
governed by state law."  Id. at *10.  In Puerto Rico, there are
"two avenues for the award of prejudgment interest."  Id.

First, under Rule 44.3(b) of the Puerto Rico Rules of Civil
Procedure,

> [t]he court will impose on the party that has **acted
> rashly** the payment of interest at the rate fixed by
> the [Finance Board of the Office of the Commissioner
> of Financial Institutions] . . . which is in effect at
> the moment the judgment is pronounced, from the time
> the cause of action arises in every case of collection
> of money and from the time the claim is filed in
> actions for damages until the date judgment is
> pronounced, to be computed on the amount of the
> judgment.

Id. at *10 (emphasis added) (quoting P.R. Laws Ap. tit. 32A, §
III, Rule 44.3(b)).  Similar to attorney's fees, this is a
penalty provision, and this Court does not find that any party

acted "rashly" in the sense that an award of prejudgment interest is proper.

A second path to prejudgment interest is statutorily mandated through Puerto Rico Laws, title 31, section 3025, which provides:

> Should the obligation consist of the payment of a sum of money, and the debtor should be in default, the indemnity for damages, if not otherwise stipulated, shall consist of the payment of the interest agreed upon, and should there be no agreement, the payment of the legal interest.
>
> Legal interest shall be deemed to be the interest fixed by the Office of the Commissioner of Financial Institutions; Provided, That such interest shall be simple interest and not compound interest.

Id. As to the amounts above, the DJM Shareholders Agreement computes all interest rates at 6%. See DJM Shareholders Agreement, § 8(d) ("Provided further that any outstanding balance shall bear interest at (6%) per annum . . .")

## V.   CONCLUSION

As set forth above, judgment shall enter in favor of DJM on its Complaint for breach of contract and specific performance, but the valuation has already been performed, and therefore the amount to be paid by DJM to Dr. Matos is **$145,426.00**.

As for the Dr. Matos Counterclaim, judgment shall enter in favor of Dr. Matos only as to Count 1 of his counterclaim for breach of contract for services rendered, as equitably adjusted, in the amount **$278,078.69**.  Judgment shall enter in favor of DJM

as to Counts 3 and 4.  As to Count 5, attorney's fees are not awarded, and prejudgment interest is awarded only as set forth in the award as to Count 1 of the Dr. Matos Counterclaim.

As for Dr. Matos Third Party Complaint, judgment shall enter in favor of Dr. Matos as only as to Count III against DEMADI, in part, only inasmuch as DEMADI is ordered to: (1) provide Dr. Matos in his capacity as a director and shareholder of DEMADI reasonable access to its books and records to the fullest extent under Puerto Rico law; and (2) shall return to Dr. Matos his capital contribution of **$100,000**.  Judgment enters in favor of the Third-Party Defendants as to all remaining claims.  As for Count V, all claims for prejudgment interest are allowed only to the extent awarded above, and attorneys' fees are denied.

As to all claims, each party is to bear their own respective costs.

**SO ORDERED.**                          /s/ William G. Young
                                          WILLIAM G. YOUNG
                                               JUDGE
                                              of the
                                          UNITED STATES[10]

---

[10] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.